# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

JAYSON HATTON, Individually and on
Behalf of All Others Similarly Situated,

    Plaintiff,

    v.                                               Case No. 14-CV-1459

CABLECOM, LLC,

    Defendant.

## DECISION AND ORDER ON PLAINTIFF'S MOTION FOR CONDITIONAL CLASS CERTIFICATION

In this putative class and collective action, plaintiff Jayson Hatton ("Hatton"), a former splicer for defendant Cablecom, LLC ("Cablecom"), alleges that Cablecom maintained several policies in violation of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"). Specifically, Hatton alleges that Cablecom had a common policy of: failing to count as hours worked the splicers' time completing location sheets and answering telephone calls and emails while on-call; deducting a half hour from the splicers' work time for lunch, even though it knew or should have known that they never took the lunch break; and failing to count on-call pay and commission when calculating the splicers' regular rate for overtime pay. Hatton seeks to certify a conditional class of similarly situated splicers employed by Cablecom within three years prior to the date of this lawsuit, November 19, 2014. Because Hatton has not made the modest factual showing necessary for conditional certification, I will deny the motion.

## BACKGROUND

*The Parties*

Cablecom is a Wisconsin corporation that performs network cabling and fiber optic installation for its customers. (Pl.'s Br. in Supp. at 2, Docket # 16.) Splicers are responsible for the installation and repair of fiber optic networks and perform their work at various customer job sites throughout Wisconsin and beyond. (Declaration of Christopher Cermak ("Cermak Decl.") ¶¶ 5-6.)

The named plaintiff in this case is Jayson Hatton. Cablecom employed Hatton as a splicer from June 16, 2014 until September 12, 2014. (*Id.* ¶ 10.)

*Alleged Policies*

After Hatton accepted an offer to work for Cablecom, he signed a document entitled the Splicer Compensation Plan (the "Compensation Plan"). (Am. Compl. ¶ 11, Docket # 13.) Under the Compensation Plan, splicers were paid a daily rate of $272 regardless of how many or how few hours worked. (Am. Compl. ¶ 11; Cermak Decl. ¶¶ 15-16.) Cablecom also paid splicers overtime if they worked more than 40 hours in a week and productivity-based bonuses and stipends for on-call time. (Am. Compl. ¶ 13; Cermak Decl. ¶¶ 18-19.)

During Hatton's tenure with Cablecom, he worked with four other splicers who all worked out of a single location maintained by Cablecom. (Declaration of Jayson Hatton ("Hatton Decl.") ¶ 2, Docket # 18.) When he first began his employment with Cablecom, Hatton worked with other splicers on the same project and filled out their time cards together. (*Id.* ¶ 4.) Hatton alleges that even though none of them ever took a half hour lunch break, he saw that the other splicers wrote on their time cards that they were taking a half hour lunch break. (*Id.*) Hatton followed suit, but alleges that he told Cablecom management that he was in fact working through the lunch breaks that he

recorded on his time cards. (*Id.*) Hatton alleges that Cablecom told him that when he worked more than 7.5 hours on an assignment, he was required to write down a half hour lunch break on my time sheet, regardless of whether he actually took the half hour lunch break. (*Id.*)

Hatton states that for each project that the splicers worked on, Cablecom required them to complete location sheets by writing down detailed information for the project. (*Id.* ¶ 9.) Hatton alleges that Cablecom required each splicer to fill out a location sheet, even when all of the splicers worked on the same project. (*Id.*) Hatton states that Cablecom supervisor Christopher Cermak would frequently remind them that they needed to fill out the location sheets accurately and completely; and would ask them to modify the location sheets if in his opinion the location sheets were not filled out accurately and completely. (*Id.*) Hatton states that it would often take an hour or more to complete a location sheet for a project and that he often did not have time to complete the location sheets during the workday. (*Id.* ¶ 10.) Consequently, he, as well as other splicers, often had to work on location sheets during their days off. (*Id.*) However, the splicers were not recording the time they spent working on these location sheets on their off days. (*Id.* ¶ 11.)

Hatton also averred that while working for Cablecom, he was on-call both during his scheduled work days and on his days off. (*Id.* ¶ 13.) While on call, he was required to respond to both telephone calls and emails, which often came from Cablecom managers and supervisors. (*Id.*) Hatton stated that he would often spend a half hour or more responding to emails and telephone calls during each day he was on-call. (*Id.*) However, Hatton alleges that Cablecom never instructed him to record on his time sheets the time that he spent responding to emails and telephone calls while he was on-call. (*Id.* ¶ 14.)

Thus, Hatton alleges that Cablecom has never counted the hours that splicers spent filling out location sheets, answering telephone calls and emails while on call, and the 30 minute lunch breaks that splicers in fact worked through as hours worked. (*Id.* ¶ 15.) Hatton further alleges that Cablecom improperly calculated his rate of overtime pay. Specifically, Hatton states that Cablecom's policy was to pay splicers $15 for each day that they were on-call. (*Id.* ¶ 16.) However, Hatton alleges that Cablecom never included the on-call pay when it calculated the average wage rate that he earned during the week, and it was the average wage rate that was used by Cablecom to calculate the overtime pay that he was due to receive during the week. (*Id.*) Further, Hatton alleges that he was to receive $2 "per burn" in commissions when he completed more than 25 "burns" per day. (*Id.* ¶ 17.) Hatton alleges that Cablecom also failed to include his "burn" commissions when it calculated his average wage rate for the week, which, once again, was used to calculate his overtime pay for the week. (*Id.* ¶ 18.) Hatton states that splicers often worked more than 40 hours per week. (*Id.* ¶ 20.)

Cablecom denies having any such policies. Cablecom avers that Hatton, as well as other splicers, were specifically told that if they did not take a meal break, they should not record a meal break on their time sheet. (Cermak Decl. ¶ 23.) Regarding completion of the location sheets, Cablecom avers that splicers have been instructed to include the time they spend completing the sheets as part of their hours worked. (*Id.* ¶ 31.) Finally, regarding calculation of overtime pay, Cablecom avers that Hatton did not work more than 40 hours per week during the weeks he earned bonuses. (*Id.* ¶ 43.) Cablecom further avers that Hatton was never put on-call, though he was paid on-call stipends on a number of occasions in error. (*Id.* ¶ 42.)

- 4 -

**DISCUSSION**

*1.  Legal Standard for Conditional Certification*

The FLSA permits collective action "against any employer . . . by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). Unlike a typical class action suit under Fed. R. Civ. P. 23, where an unwilling plaintiff must "opt out" of the class, a class action pursuant to Section 216(b) of the FLSA requires employees or former employees to "opt in" to the class, by filing a written consent to join the action. *Woods v. N.Y. Life Ins. Co.*, 686 F.2d 578, 579-80 (7th Cir. 1982) (explaining differences between collective action under the FLSA and class action certified pursuant to Rule 23). District courts may, in their discretion, facilitate notice to potential plaintiffs to a FLSA collective action, to implement this "opt in" procedure. *See Hoffmann-LaRoche, Inc. v. Sperling*, 493 U.S. 165, 169 (1989); *Woods*, 686 F.2d at 580. "The critical inquiry in determining whether a court should exercise its discretion to authorize the sending of notice to potential plaintiffs is whether the representative plaintiff has shown that she is similarly situated to the potential class plaintiffs." *Austin v. CUNA Mut. Ins. Soc.*, 232 F.R.D. 601, 605 (W.D. Wis. 2006).

"Neither the FLSA, the Supreme Court, nor the Seventh Circuit has provided guidance on how the court is to determine whether the representative plaintiff is 'similarly situated' to the potential plaintiffs. However, district courts in the Seventh Circuit have adopted a two-step approach." *Mares v. Caesars Entertainment, Inc.*, No. 06-cv-60, 2007 WL 118877, at *2 (S.D. Ind. Jan. 10, 2007); *see also Bitner v. Wyndham Vacation Resorts, Inc.*, 301 F.R.D. 354, 357 (W.D. Wis. 2014) ("[M]ost courts, including this one, apply a two-step approach to certifying collective actions."). The first step is conditional certification. Although conditional certification is not a "mere formality," a

- 5 -

Case 2:14-cv-01459-NJ   Filed 07/08/15   Page 5 of 15   Document 26

plaintiff need only make "a modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law." *Bitner*, 301 F.R.D. at 357 (internal quotations and citations omitted). This standard is "fairly lenient"; it does not involve adjudicating the merits of the claims, nor does it entail the kind of rigorous analysis typical of class certification under Fed. R. Civ. P. 23. *Id.* (internal quotations and citations omitted).

In determining whether plaintiffs have met their burden, "'courts rely on the complaint and any affidavits that have been submitted.'" *Id.* at 357-58 (quoting *Austin*, 232 F.R.D. at 606). Although there is no formula for the type or amount of evidence necessary to make the modest factual showing, in this district, plaintiffs generally put forth multiple declarations from putative class members and/or deposition testimony from the parties. *See, e.g.*, *Aguilera v. Waukesha Memorial Hospital, Inc.*, No. 13-CV-1245, 2014 U.S. Dist. LEXIS 114418, *13 (E.D. Wis. Aug. 18, 2014) (certifying class where plaintiffs' allegations were supported by the declarations of three putative plaintiffs and the deposition testimonies of several managerial representatives from defendant); *Brabazon v. Aurora Health Care, Inc.*, No. 10-CV-714, 2011 U.S. Dist. LEXIS 37057, *10 (E.D. Wis. Mar. 28, 2011) (finding plaintiff made a modest factual showing when he supported his allegations with the declarations of nine putative plaintiffs and the deposition testimony of several of the defendant's corporate representatives).

Some courts in this circuit have found that for purposes of conditional certification, factual disputes should be resolved in the plaintiff's favor. *See, e.g.*, *Bitner*, 301 F.R.D. at 358; *Berndt v. Cleary Bldg. Corp.*, No. 11-cv-791, 2013 WL 3287599, *7 (W.D. Wis. Jan. 25, 2013) ("[W]here the parties' evidentiary submissions directly conflict, they will be resolved—for purposes of this order only—in plaintiffs' favor"). Other courts, however, have found that the court is not required to accept the

plaintiffs' allegations as true. *See, e.g., Martinez v. Regency Janitorial Servs.*, No. 11-CV-259, 2012 U.S. Dist. LEXIS 8941, *4 (E.D. Wis. Jan. 26, 2012) ("While the court need not resolve the substantive merits of the plaintiffs' claims at this preliminary stage, the court is not required to accept the plaintiffs allegations as true."); *Howard v. Securitas Sec. Servs., USA*, 2009 U.S. Dist. LEXIS 3913, *10 (N.D. Ill. Jan. 20, 2009) ("In making a determination as to similarity, the court need not accept the plaintiff's allegations as true as it would with a motion to dismiss.") If the plaintiff satisfies this initial burden, the court conditionally certifies a class and authorizes notice to potential class members and the parties conduct discovery. *Kelly v. Bluegreen Corp.*, 256 F.R.D. 626, 629 (W.D. Wis. 2009).

The second step of the process occurs at the close of discovery, upon a motion for decertification from the defendant. *Bitner*, 301 F.R.D. at 358. At that point, "the court determines whether the plaintiffs are in fact similarly situated to those who have opted in." *Kelly*, 256 F.R.D. at 629. If "it becomes clear that the case is not suitable for collective treatment, the court then decertifies the collective action." *Bitner*, 301 F.R.D. at 358.

   *2.   Application to this Case*

Again, at this first stage—conditional class certification—the inquiry is whether Hatton has shown that he is similarly situated to the potential class plaintiffs. As previously stated, Hatton alleges that Cablecom maintained several policies common to all splicers that violated the FLSA. Hatton alleges that Cablecom (1) failed to count as hours worked the splicers' time completing location sheets; (2) failed to count as hours worked the splicers' time spent answering telephone calls and emails while on-call; (3) deducted a half hour from the splicers' work time for lunch, even though it knew or should have known that they never took the lunch break; and (4) failed to count

- 7 -

on-call pay and commission when calculating the splicers' regular rate for overtime pay. I will address each in turn.

*Common Policy of Failing to Count Hours Spent Completing Location Sheets*

Hatton alleges that he and the putative class members are similarly situated because they have been subject to a common policy where Cablecom failed to pay them for hours worked completing location sheets for the projects they worked on. As an initial matter, Cablecom argues that Hatton's contention that it had an unwritten policy of not compensating its splicers for time spent completing location sheets was not pled in the amended complaint and cannot be raised now for the first time. (Def.'s Resp. Br. at 13, Docket # 21.) Hatton argues that his complaint specifically alleged that Cablecom failed to take into account all of his hours worked and "[g]iven the requirement of notice rather than form pleading," the complaint "adequately encompasses all claims concerning Cablecom's failure to credit his hours worked, including hours spent completing the location sheets." (Pl.'s Reply Br. at 5, Docket # 24.) Alternatively, Hatton states that he should be permitted to amend his complaint to include allegations concerning the location sheets. (*Id.*)

I disagree with Hatton that he properly pled this claim for failure to credit time spent completing location sheets in his amended complaint. Hatton's amended complaint very clearly alleges that Cablecom's common practices include the failure to include time spent responding to emails, deducting a half hour meal break, and failing to count on-call pay and commission when calculating the splicers' regular rate for overtime pay. (Am. Compl. ¶ 35.) Nowhere in the amended complaint are the location sheets mentioned. As the court stated in *Adair v. Wisconsin Bell, Inc.*, No. 08-CV-280, 2008 WL 4224360, *5 (E.D. Wis. Sept. 11, 2008), "[i]t is to the complaint, after all, that the defendant looks for notice of the claim asserted against it. It is patently unfair to expect a

- 8 -

defendant to respond to a theory of liability that shifts with each response." Hatton's amended complaint did not provide Cablecom with notice of this new theory of liability. Hatton has not properly moved to amend his complaint to include allegations regarding the location sheets. Hatton's claim regarding the location sheets is not properly before me and I will, therefore, not entertain a motion to certify a conditional class on that claim.

*Common Policy of Failing to Count Time Spent Answering Telephone Calls and Emails*

Hatton also alleges that he and the putative class members are similarly situated because they have been subject to a common policy where Cablecom failed to pay them for hours worked answering telephone calls and emails while on-call. Hatton argues that when splicers were on-call, they were required to respond to work-related telephone calls and emails. (Pl.'s Br. in Supp. at 10.) Hatton further argues that even though Cablecom knew its splicers were answering telephone calls and emails while on-call, it designed a time card that did not permit them to record this time. (*Id.*) Consequently, none of this time was recorded as hours worked. (*Id.*) Cablecom argues that Hatton cannot pursue this claim collectively because he was never on-call during his employment with Cablecom and thus is not similarly situated to the splicers on-call. (Def.'s Resp. Br. at 14.)

Although Cablecom avers that Hatton was never on-call during his employment with Cablecom (Cermak Decl. ¶ 41), Hatton contends that he was on-call multiple days and would spend a half hour or more per day checking and responding to emails and voicemail messages while on call (Supplemental Declaration of Jayson Hatton ("Supp. Hatton Decl.") ¶ 11, Docket # 25). Even assuming Hatton was on-call, he still has not shown a class-wide policy to deny payment for time spent answering telephone calls and emails while on-call. Hatton avers that because he received email and telephone responses from other splicers while they were on-call, he knows that other

- 9 -

splicers were timely responding to such communications while on-call. (Hatton Decl. ¶ 13.) He also states that because he filled out time cards with other splicers, he knew that they were not recording time spent responding to emails and telephone calls while on-call. (*Id.* ¶ 14.)

What Hatton fails to do, however, is connect how he knows that the splicers who were responding to emails and telephone calls while on-call also failed to record and get paid for the time. Hatton does not identify the splicers that were responding to his communications while on-call, nor does he identify the splicers he observed filling out time sheets. He wants me to infer that these are the same splicers. Hatton has not provided declarations from any other splicers stating that they were not paid for this time. Although courts in this circuit have found that plaintiffs need not produce evidence that other employees wish to join a class before the class notice may be sent out, *see Heckler v. DK Funding*, 502 F. Supp. 2d 777, 780 (N.D. Ill 2007), courts have found that a "demonstrable lack of interest in a collective action is a strike against certification" *Hadley v. Journal Broad. Group, Inc.*, No. 11-CV-147, 2012 U.S. Dist. Lexis 19452, *15 (E.D. Wis. Feb. 16, 2012).

This is especially true in this case where Hatton produces no declarations from any other putative plaintiffs, in stark contrast with other cases in this district, such as *Aguilera* and *Brabazon* cited above. Although Hatton claims that he does not have the contact information of former splicers and has "no way to contact" them (Supp. Hatton Decl. ¶ 15), he does have the first and last names of four other splicers that he worked with (Hatton Decl. ¶ 2). Presumably Hatton could have, at a minimum, identified which splicer was sending responsive messages while on-call and could have stated when he observed this same splicer failing to record time responding to emails and telephone calls on his time sheet. Instead, Hatton relies solely on conclusory statements regarding seeing "other splicers" filling out time sheets. Although the standard is fairly lenient at this stage, this is not

- 10 -

enough. Thus, there is no factual basis from which to infer there was a class-wide practice of failing to pay for time spent answering emails and telephone calls.

*Common Policy of Deducting Lunch Time*

Hatton alleges that he and the putative class members are similarly situated because they have been subject to a common policy where Cablecom required them to write down a half hour lunch break even if they never took the lunch break. In his initial declaration, Hatton alleges that though he never took a lunch break during his entire tenure with Cablecom, he almost always recorded a half hour lunch break as required by Cablecom. (Hatton Decl. ¶ 7.) Hatton averred that neither he nor any other splicers was ever told by management that they should not write down a lunch break if they did not in fact take a lunch break. (*Id.* ¶ 5.) Cablecom responded by providing the declaration of Hatton's supervisor, Christopher Cermak, which included an email addressed to Hatton and several other splicers specifically instructing them not to fill out a break that was not taken. (Cermak Decl. ¶¶ 22-23, Exh. C.) Hatton then responded with a supplemental declaration acknowledging that he did receive the email, but stating that he was told in subsequent conversations with Cermak that he must write down a break regardless of whether he took one. (Supp. Hatton Decl. ¶¶ 2-3.) At the conditional certification stage, I need not make credibility determinations with respect to the evidence presented. *Berndt*, 2013 WL 3287599 at *7.

However, even if I take Hatton's facts as true, he has not shown a class-wide practice of requiring splicers to erroneously record lunch breaks. Hatton states that he observed splicers that he worked on the same project with not taking lunch breaks, but writing a lunch break down on their time sheets. (Hatton Decl. ¶¶ 4, 8.) Hatton specifically notes only four other splicers that he worked with at Cablecom. (*Id.* ¶ 2.) I am guided by two decisions from this district, *Martinez* and *Brabazon*.

- 11 -

In both *Martinez* and *Brabazon*, the court found that an automatic break deduction policy, standing alone, was an insufficient common denominator to justify a collective action. *Martinez*, 2012 U.S. Dist. LEXIS 8941 at *10-11; *Brabazon*, 2011 U.S. Dist. LEXIS at *9. The court in *Brabazon* found the "something more" to justify a collective action because the plaintiff:

> [H]as taken his allegations a step further and contends the failure of Aurora to compensate employees who work through those unpaid meal breaks, by being readily available to respond to an emergency or other urgent situation, potentially violates the FLSA. Plaintiff supports his allegations with the declarations of nine putative plaintiffs and the deposition testimony of several corporate representatives from Aurora.

2011 U.S. Dist. LEXIS at *9-10. The *Brabazon* court found that the plaintiff made the "modest factual showing" necessary to certify the conditional class because the putative plaintiffs were required to monitor their communication devices during meal periods, were required to remain available to immediately respond to situations, were generally unable to leave the premises during meal times because of the policy, and were subject to discipline if they did not immediately respond, all without pay. *Id.* at *10.

The court in *Martinez*, in contrast, declined to certify a conditional class where the plaintiff and putative class members alleged that a 30 minute break period was deducted from their checks even though they frequently had to work through the break period. 2012 U.S. Dist. LEXIS 8941 at *10. The *Martinez* court contrasted the plaintiffs' situation to that of *Brabazon*, finding that the "something more" than an automatic break deduction policy was lacking, "such as a company-wide policy of requiring workers to remain available and responsive during breaks." *Id.* In *Martinez*, the plaintiff provided the statement of a co-worker who claims that she was told by her supervisor that she was not entitled to a break. *Id.* at *11. The court found that this "at most, reflect[ed] a practice

- 12 -

Case 2:14-cv-01459-NJ   Filed 07/08/15   Page 12 of 15   Document 26

of a single work site" and stated that "[a]lleged violations that are isolated to specific locations or supervisors [were] generally insufficient for a company-wide collective action." *Id.*

Hatton's factual showing is more akin to an automatic deduction policy without "something more." Even taking as true Hatton's statement that Cermak told him that he was to write down a lunch break regardless of whether he actually took one (Supp. Hatton Decl. ¶ 3), this, at most, shows an individual violation against Hatton. Cermak's declaration shows that Cablecom's official policy was that splicers were not to record a break if one was not taken. (Cermak Decl., Exh. C.) Although Hatton claims that something different was later communicated to him by Cermak, importantly, he does not claim that this alleged policy was communicated to any of the other splicers, nor has he presented affidavits from any other splicers stating that the management at Cablecom told them something different as well. Thus, Hatton has presented, at most, isolated FLSA violations.

*Common Policy of Miscalculating Overtime Pay Rate*

Finally, Hatton alleges that he and the putative class members are similarly situated because they have been subject to a common policy where Cablecom incorrectly calculated their rate of overtime pay. Specifically, Hatton alleges that in calculating their regular rate of pay, which is then used to calculate their overtime pay, Cablecom failed to include "burn commissions" and on-call stipends. (Hatton Decl. ¶¶ 16-18.) Cablecom argues that Hatton is not similarly situated because he never had any work weeks in which he both earned a bonus and worked overtime and because he was never on-call. (Def.'s Resp. Br. at 15.) As discussed above, Hatton disputes Cablecom's statement that he was never on-call, and further argues that when including the location sheets that were not included in his hours worked, he did work over 40 hours the week that he earned burn commissions. (Pl.'s Reply Br. at 8.)

- 13 -

Hatton, at this stage, has not shown that he is similarly situated to other putative class members. Hatton argues that the Compensation Plan violates the FLSA by failing to include on-call stipends and burn commissions in the regular rate of pay, which is then used to calculate overtime pay. (Pl.'s Reply Br. at 8.) However, there is no evidence that a splicer is guaranteed to have either burn commissions or on-call stipends. Assuming the failure to include these in the regular rate of pay violates the FLSA, there is no guarantee that a splicer will actually have this pay in any given week, nor that the splicer will work overtime during that same week. Most importantly for the purpose of conditional certification, although Hatton avers that he believes other splicers worked more than 40 hours per week (Hatton Decl. ¶ 20), he does not state whether he has any personal knowledge that during those weeks, the splicers earned burn commissions or on-call stipends. Hatton includes no declarations from any other splicers that were affected by this alleged violation. Because the earning of burn commissions and on-call stipends are variable and individualized, Hatton has not demonstrated that he is similarly situated to any proposed class members.

## CONCLUSION

For the reasons stated above, I will deny Hatton's motion for conditional class certification. Hatton alleges that Cablecom violated the FLSA through common policies of failing to count as hours worked the splicers' time answering telephone calls and emails while on-call; by deducting a half hour from the splicers' work time for lunch, even though it knew or should have known that they never took the lunch break; and by failing to count on-call pay and commission when calculating the splicers' regular rate for overtime pay. However, as to the alleged FLSA violations, Hatton has failed to make even a modest factual showing that he is similarly situated to the putative class plaintiffs.

**ORDER**

**NOW, THEREFORE, IT IS HEREBY ORDERED** that the plaintiff's motion for conditional class certification (Docket # 15) is **DENIED**.

Dated at Milwaukee, Wisconsin this 8th day of July, 2015.

                                          BY THE COURT

                                          *s/Nancy Joseph*
                                          NANCY JOSEPH
                                          United States Magistrate Judge